IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA


- - - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                          :
     Plaintiff,           :
                          :
vs.                       :      Case No. 4:21-mj-11
                          :
DOUGLAS AUSTIN JENSEN,    :   DETENTION HEARING TRANSCRIPT
                          :
     Defendant.           :
- - - - - - - - - - - - - X


                          Courtroom, Fourth Floor
                          U.S. Courthouse
                          123 East Walnut Street
                          Des Moines, Iowa
                          Tuesday, January 19, 2021
                          3:36 p.m.


BEFORE:  THE HONORABLE CELESTE F. BREMER, Magistrate Judge.


APPEARANCES:

For the Plaintiff:        VIRGINIA M. BRUNER, ESQ.
                          Assistant U.S. Attorney
                          U.S. Courthouse Annex
                          110 East Court Avenue, Room 286
                          Des Moines, Iowa  50309-2053


For the Defendant:        MACKENZI JO NASH, ESQ.
                          JOSEPH HERROLD, ESQ.
                          Assistant Federal Public Defenders
                          Capital Square, Suite 340
                          400 Locust Street
                          Des Moines, Iowa  50309


        THERESA KENKEL - CERTIFIED SHORTHAND REPORTER

2

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiff | | | | |
| Tyler Johnson | 7 | 26 | | |

## E X H I B I T S

| GOVERNMENT EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 1 - Affidavit | 4 | 4 |
| 2 through 16 - Photographs | 4 | 4 |

1                    P R O C E E D I N G S

2              (In open court.)

3              THE COURT:  This is Southern District of Iowa No.

4    4-21-mj-11.  It's District of Columbia No. 1:21-06.  This is the

5    time that was set for the identity hearing and detention hearing

6    in United States versus Douglas Jensen.

7              Mr. Jensen, I know you had an initial appearance last

8    week.  You're appearing by video conference today because of

9    COVID quarantine requirements at the Polk County Jail.  Your

10   attorneys are here as is the prosecutor and any witnesses.  I'm

11   Judge Bremer.  So can you hear and see me okay?

12             DEFENDANT JENSEN:  Yes, Your Honor.

13             THE COURT:  All right.  And I've just been having this

14   coughing spell, so if I can't--if I'm not talking loud enough,

15   let us know and we can adjust the volume, okay?

16             So you received a copy of the charges which would be

17   the indictment that was filed last week in the District of

18   Columbia; right?  You got a copy of that last week; correct?

19             DEFENDANT JENSEN:  I received it about an hour ago.

20             THE COURT:  All right.  And you're charged with six

21   charges, each a separate count in the indictment.  You're the

22   only person in this indictment and it all is about events that

23   arose January 6, 2021, in the District of Columbia.

24             When this was on a complaint, which was the version of

25   the charge before the indictment, there was an attachment which

4

1   was an affidavit from the FBI agent and the Government has

2   marked that as Exhibit 1.

3          Is that correct?

4          MS. BRUNER:  Yes, Your Honor.

5          THE COURT:  Is there any objection to Exhibit 1 for

6   the purposes of this hearing?

7          MS. NASH:  No, Your Honor.

8          THE COURT:  And does Defendant have a copy of that?

9          DEFENDANT JENSEN:  Yes, Your Honor.

10          THE COURT:  Okay.  So you have Exhibit 1.  And

11   Exhibits 2 through 16 are some photographs.

12          Is the Government offering all of those?

13          MS. BRUNER:  Yes, Your Honor.

14          THE COURT:  Again, any objection to those for the

15   purposes of this hearing?

16          MS. NASH:  No, Your Honor.

17          THE COURT:  So we'll go ahead and admit 1 through 16.

18                (Government Exhibits 1 through 16 were

19                offered and received in evidence.)

20          THE COURT:  Does Defendant have a copy of the photos?

21          DEFENDANT JENSEN:  Yes, Your Honor.

22          THE COURT:  You do?  Okay.  Thank you.

23          Ms. Nash, you filed a waiver today but I'm not sure if

24   it's really a waiver and order or just an acknowledgment.  So

25   what is that?

1          MS. NASH:  Yes, Your Honor.  That was just an

2   acknowledgment of his rights.  Although, in the meantime we've

3   had an opportunity to discuss the identity and detention

4   hearings with Mr. Jensen and he has decided to waive his

5   identity hearing for purposes of today.

6          THE COURT:  All right.  So, again, I know that the

7   Judge told you last week you have a right to have an identity

8   hearing, which would mean that the Government would have to

9   prove that you're the person who's charged in this indictment

10  from the other district, and you would be entitled to see an

11  original copy of the warrant, although these days everything's

12  electronic, but you could have that.

13         So you're waiving or giving up your right to the

14  identity hearing and production of the warrant; is that correct?

15         DEFENDANT JENSEN:  Yes, Your Honor.

16         THE COURT:  So you're admitting that you're the

17  Douglas Jensen who's charged in this indictment; correct?

18         DEFENDANT JENSEN:  Yes, Your Honor.

19         THE COURT:  Okay.  So we'll go ahead.  That waiver has

20  been filed.

21         The Government has moved that you be detained or held

22  without any conditions of release being set.  I've gotten a

23  report from Pretrial Services.

24         Is it still the Government's motion that he be

25  detained?

1          MS. BRUNER:  Yes, Your Honor.

2          THE COURT:  I assume, Ms. Nash, you've gotten a copy

3   of the Pretrial Services Report?

4          MS. NASH:  We have, Your Honor.

5          THE COURT:  All right.  And you are not entitled to

6   what's called a preliminary hearing or probable cause hearing.

7   That's because the Grand Jury returned the indictment so they

8   made the probable cause hearing for the charges that were filed

9   here.

10          So what we're talking about today is whether there are

11   any conditions of release that reasonably assure your appearance

12   and the safety of the community.  And, again, the only other

13   thing, we've got to have a financial affidavit signed; is that

14   correct?  I have a blank one.  Is there a signed one?

15          MS. NASH:  Your Honor, I believe we filed the signed

16   financial affidavit this morning.

17          THE COURT:  You did.  Okay.  There it is, No. 13.

18          We're still proceeding with the Public Defender's

19   Office to represent you; correct?

20          DEFENDANT JENSEN:  Yes, Your Honor.

21          THE COURT:  And, again, do you agree or consent to

22   have this hearing by video conference today?

23          DEFENDANT JENSEN:  Yes, Your Honor.

24          THE COURT:  And, again, if at some time you can't hear

25   or if you need to see anybody, we'll flip the camera so you can

 1  see it, but if you have any concerns, just yell, say stop, and

 2  we'll make sure that the transmission is clear and you can hear

 3  and see everything.  All right?

 4          DEFENDANT JENSEN:  Thank you, Your Honor.

 5          THE COURT:  All right.  So what does the Government

 6  have in addition to the Pretrial Service Report and its

 7  affidavit?

 8          MS. BRUNER:  Your Honor, the Government calls Special

 9  Agent Tyler Johnson.

10          THE COURT:  What's going to be the easiest place for

11  him?

12          THE CLERK:  Either way, Your Honor.

13          THE COURT:  We can go ahead and use the witness stand.

14  Step forward and be sworn, please.

15          THE CLERK:  Please raise your right hand.

16           TYLER JOHNSON, GOVERNMENT'S WITNESS, SWORN

17          THE CLERK:  Thank you.  You can be seated.

18          THE COURT:  Just give us a second so we can change the

19  camera.

20          All right. Go ahead.

21                          DIRECT EXAMINATION

22  BY MS. BRUNER:

23  Q.  Agent Johnson, can you state and spell your name for the

24  court reporter, please.

25  A.  Tyler Johnson; T-y-l-e-r, Johnson J-o-h-n-s-o-n.

1  Q.  How are you employed?

2  A.  I am employed as a special agent with the Federal Bureau of

3  Investigation.

4  Q.  And how long have you been employed by the FBI?

5  A.  October of 2019.

6  Q.  Okay.  What cases--what kinds of cases, generally, do you

7  work?

8  A.  I am primarily assigned to investigate domestic terrorism

9  and international terrorism.

10  Q.  Are you familiar with the Defendant, Douglas Jensen?

11  A.  I am.

12  Q.  How is it that you're familiar with him?

13  A.  I am one of the investigators assigned to his case.

14  Q.  And you're a Des Moines agent; is that right?

15  A.  That's correct.

16  Q.  Is there an agent in D.C. that's also assigned to this case?

17  A.  Yes, there is.

18  Q.  Did you participate in an interview and arrest of

19  Mr. Jensen?

20  A.  I did.

21  Q.  I want to ask a little bit about the interview first.  Where

22  did that interview take place?

23  A.  It took place at the Des Moines Police Department in

24  Des Moines, Iowa.

25  Q.  When did that take place?

1  A.  January 8th of 2021.

2  Q.  What time of day was that?

3  A.  It was approximately 9 a.m.

4  Q.  How did that interview come about?

5  A.  Douglas Jensen arrived to the Des Moines Police Department.

6  Q.  Who was present for the interview?

7  A.  Myself and Special Agent Scott James, FBI.

8  Q.  Was that interview recorded?

9  A.  It was recorded.

10  Q.  Did you tell the Defendant that it was going to be recorded?

11  A.  He was advised it was a recorded interview, yes.

12  Q.  Did you also tell him whether or not the interview was

13  voluntary?

14  A.  Yes, he was told it was a voluntary interview.

15  Q.  And at the end of the interview, was the Defendant allowed

16  to leave?

17  A.  He was allowed to leave, yes.

18  Q.  In fact, how did he get home that day?

19  A.  We drove him home.

20  Q.  Did--I want to ask--well, we'll get back to the interview.

21  I want to talk a little bit about January 6, 2021.

22         Did the Defendant have authority to be in the Capitol

23  Building in Washington, D.C., on January 6, 2021?

24  A.  No, he did not.

25  Q.  During the interview did he state whether or not he was in

1  the Capitol Building on January 6, 2021?

2  A.   He did state being in the Capitol Building on January 6,

3  2021.

4  Q.   Did he say how he got into the Capitol Building?

5  A.   He did.  He explained during the interview that he climbed

6  up a wall and then proceeded to an exterior door and window with

7  another group of rioters.  A rioter broke that window out and

8  Mr. Jensen explained how he climbed through the window into the

9  U.S. Capitol.

10  Q.   Did he say how the window had gotten broken?

11  A.   He did.  During the interview he explained that another

12  rioter who was also outside the building opened up a bag with

13  what was described as weapons.  And that individual broke the

14  window with one of those objects and Mr. Jensen climbed through

15  the window.

16  Q.   Did the Defendant say whether or not he had a weapon on him

17  when he was in the Capitol Building?

18  A.   He did.  He told us that he had a pocketknife.

19  Q.   Have you seen that knife?

20  A.   I have.

21  Q.   How is it that you saw the knife?

22  A.   He had that pocketknife with him when he came to the

23  Des Moines Police Department.

24  Q.   During the course of law enforcement's investigation of the

25  events at the Capitol Building, has the FBI investigated an

1  incident involving a mob chasing a United States Capitol police

2  officer inside the Capitol Building?

3  A.   Yes.

4  Q.   Is there video of that incident?

5  A.   There is.

6  Q.   Has that video actually been circulating in the media?

7  A.   It has.

8  Q.   And have you reviewed that video prior to your testimony

9  today?

10  A.   I have.

11  Q.   Due to technology issues with in-custody defendants, we're

12  not going to offer the video today.  But if you look at

13  Government's Exhibits 2 through 13 that is now--that have been

14  admitted, are these screenshots of that video?

15  A.   Yes, they are.

16  Q.   How did the video begin?

17  A.   The video begins with who's been identified as Officer

18  Eugene Goodman standing in a doorway inside the U.S. Capitol.

19  When the video starts, there is a large group of rioters just on

20  the other side of that doorway.

21  Q.   And looking at Government Exhibit 2, what do we--is this

22  from early on in the video?

23  A.   It is, yes.

24  Q.   And what are we seeing here in Government Exhibit 2?

25  A.   In Government Exhibit 2 you see Douglas Jensen make his way

1  to the front of that group of rioters and start engaging with

2  Officer Goodman.

3  Q.  When you say "Douglas Jensen," is the person in that shirt

4  in the front facing the officer, do you recognize that as

5  Douglas Jensen?

6  A.  I do.

7  Q.  And is that from having spent hours with him?

8  A.  That is correct.

9  Q.  Looking at Government Exhibit 3, can you tell us what

10 transpires between 2 and then what we're looking at in 3?

11 A.  Between Exhibit 2 and Exhibit 3, Douglas Jensen begins

12 exchanging words with Officer Goodman and pointing at him.

13 Q.  And looking at Officer Goodman between 2 and 3, does Officer

14 Goodman actually back up?

15 A.  He does.  That's correct.

16 Q.  Looking at Government Exhibit 4, what's happened now between

17 3 and 4?

18 A.  Douglas Jensen has advanced through the doorway towards

19 Officer Goodman and Officer Goodman has began stepping back

20 away.

21 Q.  And I should say, so how long is this whole video?

22 A.  The video is approximately one minute.

23 Q.  So when we're looking at these different exhibits, about how

24 much time has transpired between each picture?

25 A.  A matter of seconds.

1  Q.  Looking at Government Exhibit 5, what's happened here?

2  A.  In Government Exhibit 5, Officer Goodman pushes out to push

3  Doug Jensen back away and during the video he's telling him to

4  get back.

5  Q.  Does the Defendant get back?

6  A.  He does not.

7  Q.  Looking at Government Exhibit 6, what has happened between 5

8  and 6 here?

9  A.  Between 5 and 6, Officer Goodman has retreated further into

10  the hallway as Douglas Jensen proceeds to advance towards him.

11  Officer Goodman in this image right here has actually picked up

12  a baton that was on the floor of the Capitol and at this point

13  Officer Goodman again directs Mr. Jensen to get back, which he

14  does not.

15  Q.  In his interview, did the Defendant talk about this moment

16  where the officer has the baton in his hand?

17  A.  He did.

18  Q.  And what did he say about that?

19  A.  During this encounter, Mr. Jensen told us that he tells

20  Officer Goodman, "Hit me.  I'll take it."

21  Q.  As in directing the officer to hit him?

22  A.  Correct.

23  Q.  You can look at Government Exhibit 7.  Can you tell us

24  what's transpired now between 6 and 7?

25  A.  Between 6 and 7, Officer Goodman has continued to retreat.

1  He's now retreating up a flight of stairs and Douglas Jensen is

2  running behind him chasing him.

3  Q.   And in the video, especially in between these portions, can

4  you see people behind Mr. Jensen?

5  A.   You can, yes.

6  Q.   Do you have any idea how many people were behind the

7  Defendant?

8  A.   I don't.

9  Q.   If we look now at Government Exhibit 8, what are we looking

10 at here?

11 A.   Officer Goodman again stops at the top of that flight of

12 stairs and turns around and begins to give Douglas Jensen

13 additional commands to back up, which Douglas Jensen does not

14 abide by.

15 Q.   So then if we go to Government Exhibit 9, what is happening

16 next here in the video?

17 A.   Officer Goodman continues to retreat from that top flight of

18 stairs up another section of stairs and Douglas Jensen continues

19 to chase after him.

20 Q.   So the other individual on the left in Government Exhibit 9,

21 do you recognize that as the Defendant?

22 A.   I do.

23 Q.   Looking at Government Exhibit 10, what's gone on between 9

24 and 10?

25 A.   Between 9 and 10 Officer Goodman has reached the top of the

1  last steps and he is now turned around and is engaging with

2  Douglas Jensen again continuing to tell him to get back.

3  Q.   And, again, were those people--were there more people behind

4  the Defendant?

5  A.   There were.

6  Q.   Looking--so is this the second floor landing, as far as you

7  know, in the Capitol Building?

8  A.   As far as I know, yes.

9  Q.   Looking at Government Exhibit 11, what happens in the video

10  at this point?

11  A.   At this point Officer Goodman kind of pushes on Douglas

12  Jensen's shoulder and he ends up continuing to back away from

13  Douglas Jensen and commanding him to leave.

14  Q.   If you look beyond Officer Goodman, sort of in the top left

15  there, what's in the--what's that in the distance?

16  A.   It's a corridor leading to the Senate floor.

17  Q.   At the time that this was taken, had all of the senators

18  been evacuated from the Senate floor?

19  A.   I do not believe so.

20  Q.   And were there armed law enforcement officers still on the

21  Senate floor?

22  A.   I believe there were.

23  Q.   So Government Exhibit 12, in which direction is Officer

24  Goodman going here?

25  A.   He's going away from the corridor that leads to the Senate.

1   Q.   And what is Mr. Jensen doing here?

2   A.   He's looking down the corridor that leads to the Senate.

3   Q.   What impact, if any, did Officer Goodman have in touching

4   the Defendant and then moving away from the Senate floor?

5   A.   He lured Mr. Jensen away from the Senate floor.

6   Q.   During the interview did the Defendant make any statements

7   to you about whether he knew where he was going in the Capitol

8   Building?

9   A.   He did make statements.  Those statements indicated to us

10  that he didn't know where he was in the building or where he was

11  going.

12  Q.   So looking at Government Exhibit 13, what happens next in

13  the video?

14  A.   Officer Goodman continues to retreat into the room here in

15  Exhibit 13 and Mr. Jensen continues to follow him.

16  Q.   During the interview did the Defendant state whether he had

17  confronted a black officer?

18  A.   He did.

19  Q.   Had the Defendant indicated whether or not he'd actually

20  seen this video?

21  A.   He did indicate he saw it.

22  Q.   And did he indicate whether or not he was the person in that

23  video?

24  A.   He indicated that he was the person in this video.

25  Q.   Now, throughout the video, is the Defendant seen yelling at

1  Officer Goodman and others?

2  A.  Yes.

3  Q.  Did you ask the Defendant about--did you or the other agent

4  ask the Defendant about what he was saying during this

5  encounter?

6  A.  We did.

7  Q.  And what did he say he was saying?

8  A.  He indicated that he was telling Officer Goodman, along with

9  other officers, to do their job and alluding to make arrests.

10  Q.  And who did he say the Capitol police officers were supposed

11  to arrest?

12  A.  Congress members and Vice President Mike Pence.

13  Q.  So during when all this was going on, he was trying to tell

14  the officers to go arrest congressmen and congresswomen and Mike

15  Pence?

16  A.  Correct.

17  Q.  Now looking at Government Exhibit 14, is this another

18  photograph--well, what are we looking at in Government Exhibit

19  14?

20  A.  We're looking at another photograph of Doug Jensen in an

21  encounter with Capitol Police.

22  Q.  Did the Defendant explain anything about--or the

23  significance of a shirt that he was wearing that day?

24  A.  He did.

25  Q.  What did he say about that?

1  A.   Mr. Jensen indicated to us that he wore that shirt which

2  references QAnon, he wore that shirt specifically so that QAnon,

3  or who he refers to as Q, could get the credit for the events

4  that occurred that day.

5  Q.   Have Capitol police officers described the Defendant's

6  demeanor that day?

7  A.   They have.

8  Q.   And how did they describe his demeanor?

9  A.   Loud and abusive.

10 Q.   Looking at Government's Exhibit 15, what are we looking at

11 here?

12 A.   We're looking at another photograph of Doug Jensen engaging

13 with Capitol police officers.

14 Q.   And Government Exhibit 16, can you tell us what this is a

15 photograph of?

16 A.   It's a photograph that was taken inside the U.S. Capitol in

17 which there seems to be a lot of smoke in the background and

18 Doug Jensen progressing and continuing towards Capitol police

19 officers.

20 Q.   Have you spoken with law enforcement about what that smoke

21 was?

22 A.   I have.

23 Q.   And what did they say the smoke was?

24 A.   At the time they did not know what it was, but they've come

25 to find out that it was a fire extinguisher that was smashed on

1   the ground, broke, and emitting what was contained inside of it.

2   Q.  Did they describe how it sounded when the fire extinguisher

3   was slammed on the ground?

4   A.  Yeah.  They described it as a loud bang.

5   Q.  And did they describe how the Defendant reacted to that loud

6   bang and smoke?

7   A.  They did.

8   Q.  And how did he react?

9   A.  He continued to progress through it.

10  Q.  Did they indicate whether he was upset by it or agitated?

11  A.  No, I don't know.

12  Q.  During your interview of the Defendant, did he state whether

13  or not he took an officer's hat?

14  A.  He did.

15  Q.  What did he say about that?

16  A.  He said that he took an officer's hat, put the hat on, and

17  then he tried to take a selfie with his mobile device.  At the

18  time he tried to take that picture, he said his phone powered

19  off and he couldn't get the picture.

20  Q.  Did he say why he thought his phone powered off?

21  A.  He indicated they turned it off.

22  Q.  Who did you take "they" to mean?

23  A.  I took "they" to be the U.S. Government.

24  Q.  I want to ask you now a few questions about the Defendant's

25  beliefs that he shared with you during the interview.

1    Did the Defendant say why he went to D.C. on January

2   6?

3   A.   He did.

4   Q.   Why did he go to D.C., in his words?

5   A.   He indicated that he went to D.C. to receive big news from

6   President Donald Trump.

7   Q.   And did he say what the big news was or what he thought it

8   would be?

9   A.   Yup.  He specifically--he referenced the storm and he

10  believed that there were going to be arrests made.

11  Q.   Do you know what "the storm" was in reference to?

12  A.   I don't.

13  Q.   Okay.  And arrest of who?

14  A.   Arrests of members of Congress and Vice-President Mike

15  Pence.

16  Q.   We talked a little bit about the QAnon shirt he was wearing.

17  Did the Defendant tell you he wanted to be the poster boy?

18  A.   He did.

19  Q.   And did he use those words, "poster boy"?

20  A.   He did.

21  Q.   Did he also tell you "I was trying to fire up this nation"?

22  A.   He did.

23  Q.   And did he also tell you "I'm all about a revolution"?

24  A.   He did.

25  Q.   Did he tell you whether he actually believed in Q and QAnon?

1  A.   He did.

2  Q.   What did he tell you about that?

3  A.   He's a true believer, 100 percent believes in it.

4  Q.   Even after the events of January 6th, did he say whether

5  that changed his mind at all?

6  A.   He still believes it.

7  Q.   It's hard to summarize but generally speaking, what is your

8  understanding of what QAnon is, particularly in regard to what

9  the Defendant said about QAnon?

10  A.   What Mr. Jensen told us about QAnon is an online conspiracy

11  forum in which an individual who goes by the name of QAnon, also

12  known as Q, disseminates information relating to Government

13  conspiracies, which include things such as Pizzagate, JFK, Jr.--

14          THE COURT:  Hold on a second, please.

15          Okay.  Thank you.

16  A.   --JFK, Jr., still being alive, John McCain being executed

17  and being involved with ISIS.

18  BY MS. BRUNER:

19  Q.   Are those examples you gave, are those all specific examples

20  that Mr. Jensen gave you?

21  A.   Yes.

22  Q.   And are those things he said he either believed was true or

23  might be true?

24  A.   Yes.

25  Q.   Did he--and are you aware that QAnon also has conspiracy

1   theories about human trafficking, and that's one that Pizzagate

2   refers to?

3   A.   Yes.

4   Q.   Did he say how much time he spends researching or reading

5   about QAnon?

6   A.   He did.

7   Q.   What did he say about that?

8   A.   He said in a typical day, he works an eight-hour day.  When

9   he gets home, he consumes basically exclusively a lot of this

10  information from QAnon.

11  Q.   Did he say how long he's been following these conspiracy

12  theories?

13  A.   He did.

14  Q.   About how long?

15  A.   Approximately four years.

16  Q.   During the Defendant's interview, did he say anything about

17  the so-called Insurrection Act?

18  A.   He did.

19  Q.   What's your understanding of what that refers to?

20  A.   My understanding of the Insurrection Act is an act that the

21  President of the United States can enact which would allow him

22  to establish a militia to stop an insurrection.

23  Q.   Did the Defendant say who he thought would be arrested first

24  based on the Insurrection Act?

25  A.   He did.

1  Q.  And who would that be?

2  A.  Mike Pence.

3  Q.  We talked about what--why the Defendant said he went to D.C.

4  that day.  Did he say why he marched on the Capitol?

5  A.  During the course of the interview, he indicated to us that

6  after the rally had ended, a number of the group started

7  marching towards the Capitol.  The conversation and general

8  consensus of the marchers going to the Capitol was that they

9  were going to break in.

10 Q.  Did he say what he thought they were doing when they were

11 breaking into the Capitol or what he thought would happen?

12 A.  He thought that the arrests were going to start.

13 Q.  During the course of the interview, did the Defendant

14 express any regret for the actions he took?

15 A.  The regret that he expressed was for the backlash that it

16 had on his family.  But overall, I do not believe that he

17 expressed regret for his actions that day.

18 Q.  Did he ever say "I should never have gone into the Capitol

19 Building"?

20 A.  Not that I recall.

21 Q.  Or "I should never have chased that officer in the

22 building"?

23 A.  Not that I recall.

24 Q.  Did he refer to himself as a patriot?

25 A.  He did.

1  Q.  Did the Defendant discuss whether or not he was aggressive

2  or violent?

3  A.  He did discuss that.  He indicated to us that he did not

4  believe he was aggressive or violent while he was inside the

5  U.S. Capitol.

6  Q.  Was Defendant asked what he thought will happen at the

7  Inauguration?

8  A.  He was asked that and he indicated that he believed the

9  arrests would happen.

10  Q.  The arrests of congressmen and women and Vice President Mike

11  Pence?

12  A.  Correct.

13  Q.  Was the Defendant asked if he had been evaluated for mental

14  health issues?

15  A.  He was.

16  Q.  What did he say?

17  A.  He said, "No, not really."

18  Q.  Was he then told by FBI agents that it was important that he

19  be honest with the FBI?

20  A.  He was.

21  Q.  Did he change his answer?

22  A.  He did not.

23  Q.  Did the Defendant state what his view of federal law

24  enforcement agencies is?

25  A.  He did.

1  Q.  What did he say?

2  A.  He described the FBI and the CIA as corrupt.

3  Q.  Are you aware whether or not there were any casualties or

4  injuries as a result of the riot at the Capitol?

5  A.  I am aware that there were.

6  Q.  What are you aware of?

7  A.  I'm aware there was a female who lost her life inside the

8  U.S. Capitol on January 6th and then another officer, a D.C.

9  police officer, lost his life due to injuries sustained during

10  the January 6th riot.

11  Q.  Are you aware that there were many other injuries as a

12  result of the riot?

13  A.  Correct.  Yes.

14  Q.  And has the FBI made any public statements as to whether

15  there's any current threat to any state capitals or the national

16  capital between now and tomorrow, the inauguration?

17  A.  Yes.

18  Q.  What's the general nature of that public information?

19  A.  That there is information that they are aware of on

20  additional planned protests and rallies in both D.C. and

21  capitals across the United States.

22          MS. BRUNER:  Those are all my questions.

23          THE COURT:  All right.  Do you have any questions?

24          MS. NASH:  Yes, Your Honor.  Thank you.

25          THE COURT:  All right.

1          CROSS-EXAMINATION

2   BY MS. NASH:

3   Q.   You testified that Mr. Jensen voluntarily came to the

4   Des Moines Police Department; is that right?

5   A.   That's right.

6   Q.   And did he tell you that he walked to the Des Moines Police

7   Department?

8   A.   He did.

9   Q.   Do you recall how far?

10  A.   I recall approximately six miles.

11  Q.   And did he tell you why he came to the police department?

12  A.   He wanted to talk to somebody in law enforcement.

13  Q.   And why was that?

14  A.   I do not recall.

15  Q.   Did he see himself on the news?

16  A.   He did.

17  Q.   And he was prominently featured in the news; is that right?

18  A.   That's correct.

19  Q.   And he was identified almost immediately?

20  A.   The exact timeline of--between January 6th and when he was

21  identified, I don't know the exact timeline.

22  Q.   Was it within a matter of days?

23  A.   Yes.

24  Q.   And he took no measures to conceal his face or identity at

25  the Capitol; is that right?

1  A.   Not that I know of.

2  Q.   Did he tell you that his wife was unhappy with him when he

3  came back?

4  A.   He did.

5  Q.   And she suggested that he turn himself in?

6  A.   I was not aware of that.

7  Q.   Mr. Jensen told you that he went to Washington, D.C., to

8  attend a rally put on by Donald Trump; is that right?

9  A.   That's correct.

10  Q.   And that he had no prior plans to go to the United States

11  Capitol?

12  A.   That's correct.

13  Q.   And did he tell you that he only decided to March to the

14  Capitol at the conclusion of the rally because Donald Trump said

15  to go to the Capitol?

16  A.   That's what he told us, yes.

17  Q.   And when he got to the Capitol, he told you that he felt

18  like he was being led in by law enforcement officers?

19  A.   That's what he stated.

20  Q.   And he felt like Officer Goodman was waving him along as he

21  went up the stairs?

22  A.   That's what he stated.

23  Q.   And, in fact, Officer Goodman was trying to lead him up the

24  stairs; is that right?

25  A.   I don't know Officer Goodman's exact intentions but my

1  understanding was yes, he was leading him away.

2  Q.   And Mr. Jensen, you testified, had no idea where he was

3  going?

4  A.   That's correct.  That's what he told us.

5  Q.   And Mr. Jensen told you that law enforcement officers were

6  being cordial with him?

7  A.   He did state that to us, yes.

8  Q.   And that they walked him out of the Capitol?

9  A.   He did state that, yes.

10 Q.   Law enforcement officers at the Capitol didn't arrest

11 Mr. Jensen while he was there; right?

12 A.   That's what Mr. Jensen stated, yes.

13 Q.   Are you aware of any arrests made of Mr. Jensen at the

14 Capitol?

15 A.   I am not.

16 Q.   Or any attempt at arrest?

17 A.   I am not.

18 Q.   And Mr. Jensen you testified had a pocketknife?

19 A.   Yes.

20 Q.   And he told you that he took that to the Capitol?

21 A.   He did.

22 Q.   There's no indication that Mr. Jensen took the knife out of

23 his pocket at all while he was at the Capitol?

24 A.   Not that I'm aware of.

25 Q.   And Mr. Jensen didn't have any other weapons that you're

1  aware of; is that right?

2  A.  Not that I'm aware of.

3  Q.  Mr. Jensen also told you that he didn't have knowledge of

4  anyone else's possession of weapons at the Capitol; is that

5  right?

6  A.  That's correct.

7  Q.  Until the point in time when he said that he saw someone

8  pull a weapon out of a backpack?

9  A.  That's correct.

10  Q.  Did he tell you what that weapon was?

11  A.  He initially described it as a weapon and then proceeded to

12  describe it as a club of some sort.

13  Q.  And Mr. Jensen didn't bring any zip ties with him?

14  A.  Not that I'm aware of.

15  Q.  Or any other tactical equipment?

16  A.  Not that I'm aware of.

17  Q.  Mr. Jensen didn't damage any property?

18  A.  Not that I'm aware of.

19  Q.  And he didn't steal any property?

20  A.  Not that I'm aware of, no.

21  Q.  And he didn't strike anyone?

22  A.  Not that I'm aware of, no.

23  Q.  And he testified about a fire extinguisher being thrown on

24  the floor where Government 16, the picture, was taken?

25  A.  Yup.

1  Q.  Mr. Jensen didn't throw that fire extinguisher on the floor

2  and cause it to explode, did he?

3  A.  Not that I'm aware of.

4  Q.  You also testified about casualties and injuries sustained

5  by individuals present at the Capitol.  Mr. Jensen didn't cause

6  those casualties or injuries; is that correct?

7  A.  Not that I'm aware of.

8  Q.  And this is a very well-documented incident; is that right?

9  A.  Yes.

10  Q.  Did Mr. Jensen tell you where he was getting information

11  regarding what he thought was going to take place at the

12  Capitol?

13  A.  He did.

14  Q.  And where did he say he heard that?

15  A.  Predominately social media.

16  Q.  From Rudy Giuliani--

17  A.  I recall--

18  Q.  --and Lin Wood?

19  A.  I recall him stating Lin Wood.

20  Q.  And Donald Trump?

21  A.  I do recall that, yes.

22  Q.  And you also testified that Mr. Jensen said he was a true

23  believer of QAnon and that he still believes, in your opinion;

24  is that right?

25  A.  That's correct.

1  Q.  Several times throughout the course of your interview with

2  Mr. Jensen did he ask you questions to the effect of, "Am I

3  being duped?"

4  A.  He did.

5  Q.  And explicitly at the end of the interview he asked you "Can

6  you guys let me in on that, if you know if these arrests are

7  real?"

8  A.  He did ask that.

9  Q.  And what was your response?

10  A.  My response was that "I don't know."

11  Q.  And Mr. Jensen indicated to you that he wasn't aware of any

12  future events planned; is that right?

13  A.  As I recall, yes.

14  Q.  Or that he had any intent to take part in any possible

15  future events?

16  A.  As I recall, yes.

17  Q.  And you testified a little bit about the FBI's information

18  about events planned during the inauguration.  Mr. Jensen didn't

19  indicate to you that he had any intention of going anywhere for

20  the inauguration; is that right?

21  A.  That's correct.

22  Q.  And Mr. Jensen was fairly forthcoming with you regarding his

23  beliefs and what he expected to happen that day; is that right?

24  A.  He was.

25  Q.  Regarding the arrests that Mr. Jensen believed were to take

1  place, did he give you any indication that he intended to

2  participate in effectuating those arrests?

3  A.  He did not.

4  Q.  And at the conclusion of the interview you testified that

5  you drove Mr. Jensen home?

6  A.  That's correct.

7  Q.  And you told him not to go anywhere; is that right?

8  A.  I do not recall telling Mr. Jensen not to go anywhere.

9  Q.  Maybe not to leave the state?

10 A.  It was advised--he asked if he should leave or if he should

11 not leave.  We advised him that he should probably stay.

12 Q.  And he did stay; is that right?

13 A.  He did, yes.

14         MS. NASH:  I have nothing further.  Thank you.

15         MS. BRUNER:  No redirect, Your Honor.

16         THE COURT:  All right.  Thank you.  We'll go ahead and

17 excuse the witness.

18                         (Witness excused.)

19         MS. BRUNER:  And there's no further evidence, Your

20 Honor, just argument.

21         THE COURT:  All right, thanks.  And I don't know if I

22 said Exhibits 1 through 15 or 1 through 16, but it's 1 through

23 16, and that's what will be admitted for the purposes of this

24 hearing.

25         For Defendant, any proffer or testimony?

1          MS. NASH:  Yes, Your Honor, just proffer.

2          THE COURT:  Okay.

3          MS. NASH:  By way of proffer, if released Mr. Jensen

4    would return to his residence with his wife, April Jensen.  She

5    is his wife of almost 20 years.  Together they have three

6    children.

7          Mrs. Jensen confirms that Mr. Jensen can return home.

8    Mrs. Jensen, as noted in the bond report, has stable employment.

9          By way of proffer, Mrs. Jensen indicated that while

10   she was aware that Mr. Jensen was going to Washington, D.C., for

11   a rally, she was not aware that it would evolve into anything

12   more than a political rally.

13         Upon Mr. Jensen's return, Mrs. Jensen, having seen

14   the news, told Mr. Jensen to go talk to law enforcement.

15   Mrs. Jensen also confirmed that she's willing to serve as

16   Mr. Jensen's third-party custodian if Mr. Jensen is released

17   pending trial.

18         Also, as noted in the bond report, Mr. Jensen has

19   employment waiting for him if released.  I confirmed with

20   Mr. Jensen's prospective employer that he would hire Mr. Jensen

21   if Mr. Jensen is released.  Mr. Jensen has worked for him in the

22   past and he has known Mr. Jensen for 15 years.

23         The prospective employer indicated that Mr. Jensen

24   would work 20 to 40 hours per week until March, at which point

25   their busy season begins and Mr. Jensen would be working 40 or

1   more hours per week.

2          Also by way of proffer, Mr. Jensen was born in

3   Des Moines, has lived here for the vast majority of his life.

4   He has no ties outside of the United States.  Mr. Jensen has a

5   passport.  The last time he traveled out of the United States

6   was in 2005 for a family vacation to Mexico.  He's willing to

7   surrender his passport.

8          With regard to the 2015 domestic incident that's noted

9   in the bond report, Mr. Jensen would proffer that the victim of

10  that incident was not his wife.

11         Mr. Jensen has been on supervision in the past and had

12  no violations.  He did not miss any court dates.  Mr. Jensen

13  indicated he's willing to submit to any conditions of release

14  deemed appropriate by the Court, including, but not limited to,

15  ankle monitoring, home detention, internet monitoring and

16  limitations, substance abuse evaluation, and any recommended

17  treatment.

18         Thank you.

19         THE COURT:  And so, again, just from the Pretrial

20  Services Report, he was discharged from probation in 2016 from

21  the Minnesota convictions; is that right?

22         MR. HERROLD:  Correct, Your Honor.

23         THE COURT:  So he has not been on any supervision

24  between then and now; correct?

25         MR. HERROLD:  Correct.

1          THE COURT:   Okay.   Thank you.

2          Argument from the Government?

3          MS. BRUNER:   Thank you, Your Honor.

4          Your Honor, in this case the factors weigh toward

5    detention both due to the risk of nonappearance and due to the

6    safety of the community.

7          When we look at the weight of the evidence, the weight

8    is extremely strong in this case.  He admitted to his conduct at

9    length in an interview, there is a video of it, of a portion of

10   his conduct, I should say, and he is clearly displayed because,

11   as he said, he wanted to be the poster boy for this, he wanted

12   to get the attention for it.

13         The Grand Jury has found probable cause for six

14   offenses and so the evidence here is strong.  When we look at

15   the nature and circumstance of the offenses that are charged, I

16   don't really know the right word for it.  "Serious" is not quite

17   the right word, certainly serious.  He's at the front lines of a

18   massive riot on the nation's Capitol.  He was not escorted into

19   the building.  He, in his own words, say that he went in through

20   a window when someone else used what he described as weapons to

21   break into that window, and he went in with a knife on his

22   person.

23         He led a mob of individuals against a lone police

24   officer who was trying to protect the Capitol and congressmen

25   and women who were there trying to do their job that they were

1   democratically elected to do.  He knew at that point, when he's

2   chasing the officer, he knew that this was violent, he knew he

3   was being aggressive, he knew he was being violent because he

4   told the officer to "hit me."  He tried to get the officer to

5   hit him.  I don't want to really think about what would have

6   happened if the officer had done that and taken the bait.

7          When we talk about Officer Goodman leading him away,

8   he led him away from the Senate floor on the second floor, which

9   I think undoubtedly saved lives that day.  He wasn't leading him

10  up the stairs.  He repeatedly told him to stop, go away, and the

11  Defendant keeps going at him, keeps coming at him, coming at

12  him, coming at him, and Officer Goodman keeps having to back up.

13  Then he tried to make the best decision he could and send him in

14  the other direction.

15         There were multiple deaths that day, many injuries

16  that day, and the Defendant himself said he wanted a revolution.

17  He was there for a revolution and he was there for the arrest of

18  the Vice President and the members of Congress.  So I don't know

19  what that means for them to be arrested, but it certainly wasn't

20  going to be peaceful like the arrest of the Defendant was.

21         When we look at his physical and mental condition,

22  there's a--I'll just refer to the mental health history and the

23  current treatment that's referenced in the Pretrial Services

24  Report on page 3.  He lied about this in his interview.  He

25  denied any mental health evaluation or diagnosis when he was

1  interviewed by the FBI.  When he was told "It's important you're

2  truthful with us," he doesn't correct himself.

3        The conspiracy theories that he believes, that he

4  still truly, 100 percent by his own words, believes are absurd,

5  they are outlandish, and they led to this riot on the Capitol.

6        The key tenet is the election is fraudulent and he

7  still thinks tomorrow that there are going to be arrests,

8  arrest of the Vice President, arrests of members of Congress,

9  and there are real threats out there in D.C. and against state

10 capitals because of people like the Defendant and this belief

11 system.

12       Someone who has the beliefs that the Defendant has is

13 not someone who can be trusted to abide by the rules of this

14 Court, by the orders of this Court, to appear when he's supposed

15 to appear, because his whole belief system is that our

16 democratically-elected government is illegitimate and that he

17 wants a revolution.  So that's not someone who can be trusted

18 upon to come to court when he's supposed to be here.

19       He does have a wife.  I'd say it's really

20 inappropriate for somebody of the Defendant's age to have a

21 third-party custodian, and she did know he was going to D.C.,

22 she knows about his belief system.

23       He has little to no contact with his sisters,

24 according to the bond report; he has minor daughters in his

25 home, which is a concern, Your Honor.

1          He does have--in the Pretrial Services Report and

2    Defendant's proffer he does have another job he can take, but he

3    was fired by his employer.

4          He has assets that are detailed in the report, so he

5    does have resources should he decide to leave the state where

6    everyone seems to know his photograph and his name.

7          When you look at the factors in terms of his history

8    of drug or alcohol abuse, he reports daily marijuana use, he

9    reports drinking six alcoholic beverages at a time until

10   intoxication at least monthly.  That's also detailed on page 3

11   of the Pretrial Services Report.

12         When we look at his criminal history it is concerning

13   in 2015 he pled guilty to a domestic assault, intentionally to

14   inflict bodily harm, and then the disorderly conduct that's

15   listed there.  I don't think it's--it doesn't do him any favors

16   that it wasn't his wife.  I'm not really sure how that's

17   relevant.

18         When we look at the factors and consider the

19   seriousness of the danger to any person or the community that

20   would be posed by his release, I think he is a danger both

21   locally and on a national level.  There are continued threats

22   against State and Federal Government and we all know that the

23   need to disrupt and dismantle those threats has led to a

24   wide-scale effort by law enforcement.

25         He rejects the--he rejects law enforcement, the FBI is

1  corrupt, the CIA is corrupt, members of government are human

2  traffickers.  He believes that tomorrow there's going to be

3  arrests--

4        THE COURT:  All right.  Let's just get it condensed

5  here to factors relating to release.  I heard you the first time

6  on that, okay?

7        MS. BRUNER:  Well, Your Honor, my last point would

8  just be that there is every reason to think that he would

9  continue to rejoin these efforts.

10        And then, finally, we note that the Probation Office

11  does recommend detention in this case, that the Probation Office

12  has made a finding that they cannot adequately supervise the

13  Defendant.

14        And, finally, if the Court would release the

15  Defendant, we ask that that release order be stayed as the

16  District of Columbia has indicated that they would appeal the

17  release of the Defendant.

18        THE COURT:  Okay.  Thank you.

19        So argument for the Defendant?

20        MR. HERROLD:  Your Honor, I guess first off, I'm not

21  sure what prong of the statute the Government is asking for

22  detention under here.  If they're asking under (f)(1)(A), I

23  don't see a crime of violence that's been alleged in the

24  indictment from D.C., not in the categorical sense, which is

25  what the statute requires here.

1          You've got civil disorder, which is a Class D felony,

2   kind of a lead count here.  The elements of that offense, it

3   reads "Whoever commits any act to obstruct, impede, or interfere

4   with an officer in the performance of their duties incident to

5   civil disorder which does in fact obstruct, delay, or adversely

6   affect conduct or performance of a federally-protected

7   function," with civil disorder--

8          THE COURT:  Okay.  Wait.  Just take a breath.  Thank

9   you.

10          MR. HERROLD:  --with civil disorder being then defined

11   in the Code as any public disturbance involving acts of violence

12   by three or more persons that causes an immediate danger or

13   results in damage or injury to the property or person of any

14   other individual.

15          It's not a requirement that he commits the act of

16   violence, it's just being part of what the Government is

17   characterizing as a riot or a mob in their argument and

18   testimony, but civil disorder is defined in the statute there.

19          And the only case--there's not a lot that I could find

20   related to that--where this has been actually levied against

21   people involved evidence that the Defendant charged with it

22   actually did an act of violence or something along those lines,

23   not just being there.  Obviously the merits of all this are for

24   D.C. on another day, but that's not categorically a crime of

25   violence under the elements of that offense.

1          Then the rest of these are misdemeanors.  The next

2    closest thing you have is this resisting and impeding officers

3    under 18 US Code Section 111(a)(1).  Elements of that offense

4    are forcibly assaults, resists, opposes, impedes, intimidates or

5    interferes with any person while engaged in their official

6    duties.  That's a Class A misdemeanor as charged by D.C. in this

7    indictment.  If they want it to be more than that in D.C., they

8    haven't pled it right.

9          And the Supreme Court in Jones versus the United

10   States made that clear, that there's multiple crimes that have

11   to be pled in the indictment to reach those higher levels.  And

12   while assault is an element of that type offense, at the basic

13   level it's simple misdemeanor assault as defined in the Code

14   here, which does not meet the physical force requirement to be a

15   crime of violence under the Bail Reform Act statutes here, as

16   interpreted after the Supreme Court in Johnson 1, where they

17   said physical force means violent force, force capable of

18   causing physical pain or injury to another person.  A violent

19   active crime is what they're looking for here.  It's a

20   categorical analysis there.  Beyond that, the rest of these,

21   again, more misdemeanors that basically involve forms of

22   trespass on the Capitol grounds here.

23         So I think the Government is left to try to argue, if

24   they even request detention under a theory of the (f)(2) prong

25   here, a serious risk that he will flee or a serious risk that

1   he'll somehow obstruct or attempt to obstruct justice; threaten,

2   injure, or intimidate, or attempt to threaten, injure, or

3   intimidate a prospective witness or juror here.

4           I mean, there's no doubt that the events in Washington

5   on January 6th were chaotic.  The ramifications of all that are

6   still being investigated across the country.  All the charges

7   against the people so far, that we've seen in the media and

8   heard about in the system here, involves this kind of question

9   of civil disorder versus civil disobedience.  The charges

10  against Mr. Jensen fall under that same kind of question, where

11  the line is for him.

12          At the end of this thing in D.C. it will come down to

13  where he falls in that line based on his individual actions,

14  civil disorder versus civil disobedience.  That, again, all goes

15  to the merits of the case that has to be resolved in D.C.

16  We're not here today to figure that part of this out.

17          Today is just whether there is a serious risk of

18  flight from prosecution here, or a serious risk if he would

19  somehow obstruct justice, and that the risks are so serious that

20  there is no condition, none, available in release that would

21  reasonably assure the safety of the community or his future

22  appearance for court proceedings.

23          The Government can't show a serious risk of flight

24  here.  Mr. Jensen has no history of failing to appear for court

25  proceedings.

1        He went to Washington for an event organized by the

2   President and President supporters.  His actions here were being

3   recorded on video, he knew they were being recorded, it's

4   obvious.  He pushed to the front of the group, made himself

5   prominent throughout the whole thing, in a way kind of mugging

6   for the cameras.

7        And then after the events that day he came home.  He

8   sees the news and he walks to the police station and voluntarily

9   consents to a four-hour interview with law enforcement.  They

10  didn't arrest him at that point.  In fact, gave him a ride home,

11  told him not to go anywhere, or suggested that he not go

12  anywhere, and he didn't.  So when they come back to arrest him,

13  there he was.

14        And that's all because he does take this seriously and

15  because his home is here.  He's a nearly life-long Iowa

16  resident.  He went to school here.  His wife of nearly 20 years

17  lives here.  His children are here.  He gets his medical care

18  here.  He owns his residence.  His wife works in the suburbs in

19  the Des Moines area and Mr. Jensen has worked here for the past

20  15 years and has even lined up new work here, if the Court

21  releases him, in the Central Iowa area.

22        His whole life is here.  His ties to the community are

23  deep and they're substantial and there's no reason to believe

24  he's going to run away from all of that in order to run from the

25  charges against him in this case.

1          Nor can the Government here show a serious risk that

2    he's going to engage in some sort of obstruction of justice or

3    obstructive behavior in regards to the case in the future.  And

4    while the charges against him all involve allegations that are

5    arguably some form or derivation of obstructive behavior, it

6    again all comes back to where he is going to fall in that line

7    between violent civil disorder allegations or civil disobedience

8    when this case plays out in the grand scheme of things in D.C.

9          But there's not indication here of any serious risk of

10   future obstruction of justice in this case that's been levied

11   against him.  He voluntarily approached law enforcement after he

12   returned home to Iowa, and that's likely been to the overall

13   detriment of his case in D.C. because of his statement.

14         During his past problems with the law, which I think

15   are fairly limited, as referenced in the bond report, he

16   completed his probationary term successfully and without any

17   incident.  So any argument that he might somehow engage in

18   obstruction of justice going forward is just purely speculative

19   and the release statute I think requires more than speculation

20   to keep someone detained prior to an adjudication in their case.

21         Again, there's no crime here that's categorically a

22   crime of violence.  The only felony alleged is the civil

23   disorder offense which did not contain an element of the use, or

24   threatened use, of physical force.

25         The impeding an officer allegation is charged as a

1  misdemeanor, and simple assault, again, does not require that

2  degree of physical force that the Supreme Court has held is

3  required to meet that federal definition of crime of violence.

4          And even the specific facts alleged against Mr. Jensen

5  in that misdemeanor charge don't show violent force here capable

6  of causing physical pain or injury sufficient to meet that

7  threshold to qualify as a crime of violence under the Code.

8          He's not a particular danger to the community.  His

9  criminal history is pretty limited.  It mostly occurred in his

10  mid-20s.  He's 41 now.  He's completed those probationary terms

11  in the past and will likely have one criminal history point, by

12  my estimate, under the Federal Sentencing Guidelines when they

13  delve further into his case.  Those guidelines, as we all know,

14  are not known for being particularly merciful in how they score

15  people.

16          Even if you think that the Government has reached its

17  threshold here to even request detention, there's ample

18  conditions available to reasonably assure the safety of the

19  community and his future appearance as required.

20          He already is receiving mental health care in the

21  community.  The Court can order further evaluation and treatment

22  if necessary.  He is receptive to substance abuse evaluation and

23  treatment to alleviate any concerns about his drug use or

24  history of drug use.

25          If the concern is that he has been or will somehow be

1  further radicalized by the internet use, that use can be

2  monitored or even prohibited completely while he's on pretrial

3  release.

4          He's got a good work history, a new job lined up with

5  an employer who's aware of the obviously high-profile nature of

6  this situation and yet is still willing to employ him.

7          Mr. Jensen's a long-time union member.  He also has

8  those resources available to him if his work dries up while this

9  case is going forward in D.C.

10         He has a home, no firearms in that.  He can surrender

11 his passport.  His wife is not an adherent or follower of QAnon.

12 She wants him back in the home.  She understands what's involved

13 with being a third-party custodian.  She's willing to assist

14 Pretrial Services in supervising Mr. Jensen.

15         And if all that is still not enough, the Court has

16 options like putting him on electronic monitoring and watching

17 his every step and move.  They can put him on home detention and

18 just keep him locked down while the whole case goes forward, not

19 leaving for anything he's not allowed to leave for.  Or if

20 there's a halfway house bed, they can place him there.

21         The Court can even require, it's not usually something

22 we do in this district, but post a bond if you feel like he

23 needs to have a monetary stake in his release from custody.

24         So in this case against Mr. Jensen, it all stems from

25 this chaotic series of events in Washington leading up to and on

1  January 6th, but there's nothing about him individually that's

2  so chaotic such that he just simply cannot be released from

3  custody and placed on pretrial supervision while his case goes

4  forward.  His crimes are not crimes of violence, he does not

5  pose a serious risk of flight or a serious risk of obstructing

6  administration of justice in his case as it goes forward.

7          He's only accused of the felony and these misdemeanors

8  at this point.  The Bail Reform Act favors pretrial release over

9  pretrial detention.  And to the extent that there are any

10  concerns that the Court has about him, all of them can be

11  addressed through the conditions of supervision that are

12  available to the Court to impose on Mr. Jensen.

13          Under all these circumstances the Court should order

14  Mr. Jensen released to the supervision of the Pretrial Services

15  Office and have him report to D.C. for his next court date as

16  directed.

17          Thank you, Judge.

18          THE COURT:  All right.  Thank you.  Anything else,

19  briefly, from the Government?  And, again, just--I would like

20  some clarification.  Are you under 18 USC 3142(f)(1), (f)(2), or

21  any other basis?

22          MS. BRUNER:  We're under (f)(1)(A), crime of violence,

23  and we would point to Counts 1 and 2 of the indictment, civil

24  disorder and assaulting a police officer.  And also we're

25  proceeding under (f)(2)(A) and (B), Your Honor.

1       THE COURT:  All right.  Anything else in response?

2       MR. HERROLD:  I think I already laid it out, my

3   position.  I don't think it qualifies.

4       THE COURT:  No, I'm sorry.  I didn't know if the

5   Government was finished.

6       MR. HERROLD:  Oh, I'm sorry.

7       THE COURT:  Was that your whole thought on that?

8       MS. BRUNER:  Yes, Your Honor, unless you would like

9   further clarification, yes.

10      THE COURT:  No.

11      MS. BRUNER:  That's our position, Your Honor.

12      THE COURT:  All right.  Thank you.

13      I'm going to take this under advisement and get you a

14  written order tomorrow.  If I order the Defendant detained,

15  well--well, whatever I order, either party has 14 days to

16  appeal.

17      On the Government's request for a stay, I'll take that

18  under advisement, too.  Typically if I do an order of release,

19  we do give people time--the Government time to get a stay if it

20  seems to be appropriate in the circumstances; and if so, have

21  that as one of the issues.

22      But I will get you an order as promptly as I can so

23  you know what is going on here.  We do have instructions from

24  the District of Columbia, as to if Defendant's released, they're

25  doing their Zoom hearings and the time and the day of the week

1  that they do those, so we found that information so if I need

2  that, it will be included.

3          Again, I'll take this under advisement under the

4  conditions of the Bail Reform Act, okay?

5          All right.  Thank you.

6          Thank you, Mr. Jensen.  Your attorneys will talk to

7  you later.

8              (Proceedings concluded at 4:36 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

50

1                   C E R T I F I C A T E

2           I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated;

6           That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to typewriting under my direction and supervision, and

9    that the foregoing typewritten pages are a full and complete

10   transcript of the shorthand notes so taken.

11          Dated at Des Moines, Iowa, this 9th day of February,

12   2021.

13

14

15                              *Theresa Kerkel*
                     CERTIFIED SHORTHAND REPORTER
16

17

18

19

20

21

22

23

24

25